**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Illinois Policy Institute and the Technology & Manufacturing Association, | |
| Plaintiffs, | Case No. 1:24-cv-06976 |
| v. | Hon. Franklin U. Valderrama |
| Jane R. Flanagan, in her official capacity as Director of the Illinois Department of Labor, | |
| Defendant. | |

**<u>DEFENDANT'S MEMORANDUM IN SUPPORT OF HER MOTION TO DISMISS</u>**

December 24, 2024

Alex Hemmer
R. Henry Weaver
Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603

**Table of Contents**

Introduction ............................................................................................................1

Applicable Legal Standards ....................................................................................1

Background .............................................................................................................2

    The Worker Freedom of Speech Act .................................................................2

    The Director's Role with Respect to the Act .....................................................3

    Plaintiff Illinois Policy Institute and Its Sister Illinois Policy Action ...........5

    Plaintiff the Technology & Manufacturing Association.....................................6

    Plaintiffs' Pre-Enforcement Facial Challenge to the Act .................................7

Argument ................................................................................................................7

   I.  Plaintiffs cannot demonstrate that they overcome sovereign immunity or that they have Article III standing. .............................................................7

     A.  The *Ex parte Young* exception does not apply because Plaintiffs have not sued a state official about to enforce the Act against them. ....................................7

       1.  The Director lacks authority to enforce the Act.....................................9

       2.  The Director is not threatening enforcement against Plaintiffs. ...........10

     B.  Plaintiffs cannot demonstrate Article III standing because their injuries are speculative and would not be redressed by an injunction against the Director. ..........13

       1.  Plaintiffs cannot show injury because there is no credible threat of enforcement against them. ...............................................................13

       2.  Plaintiffs cannot show causation and redressability because no relief granted against the Director could prevent their alleged injuries. ........................15

  II.  Plaintiffs furthermore fail to allege their standing for reasons specific to them...............16

  III. Finally, Plaintiffs fail to prove their standing for reasons specific to them.......................18

Conclusion ............................................................................................................20

**Table of Authorities**

## Cases

*1st Westco Corp. v. Sch. Dist. of Philadelphia*, 6 F.3d 108 (3d Cir. 1993) ...................................12

*Amling v. Harrow Indus. LLC*, 943 F.3d 373 (7th Cir. 2019) ........................................................1

*Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440 (7th Cir. 2009).........................2, 8, 18

*Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015) .................................................11

*Aroostook Band of Micmacs v. Ryan*, 404 F.3d 48 (1st Cir. 2005) .............................................12

*Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289 (1979) ............................................17

*Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274 (7th Cir. 2020) ....................................19–20

*Bell v. Keating*, 697 F.3d 445 (7th Cir. 2012)..............................................................................18

*Bevis v. City of Naperville*, 657 F. Supp. 3d 1052 (N.D. Ill. 2023) .............................................11

*Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023) ..........................................................11

*Brown v. Kemp*, 86 F.4th 745 (7th Cir. 2023)........................................................................14–15

*Children's Healthcare is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412 (6th Cir. 1996) ...................................................................................................................................12–13

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ..............................................................14, 16

*Crawford v. United States*, 796 F.2d 924 (7th Cir. 1986)............................................................20

*CSWS, LLC v. Madigan*, 2009 WL 1789368 (N.D. Ill. June 24, 2009).......................................12

*Doe v. Holcomb*, 883 F.3d 971 (7th Cir. 2018) ......................................8–10, 12–13, 15

*Doyle v. Hogan*, 1 F.4th 249 (4th Cir. 2021) ...............................................................................12

*Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508 (7th Cir. 2021)................................8–9

*Evers v. Astrue*, 536 F.3d 651 (7th Cir. 2008) ...............................................................................2

*Ex parte Ayers*, 123 U.S. 443 (1887) ..........................................................................................11

*Ex parte Young*, 209 U.S. 123 (1908) ........................................................7–9, 11–13, 15

*Farnik v. F.D.I.C.*, 707 F.3d 717 (7th Cir. 2013) ...........................................................................1

*FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024) ..........................................13, 15

*Fitts v. McGhee*, 172 U.S. 516, 530 (1899) ....................................................................1, 11–13

*Flynn v. FCA US LLC*, 39 F.4th 946 (7th Cir. 2022).....................................................................20

*Goldman v. City of Highland Park*, 2024 WL 98429 (N.D. Ill. Jan. 9, 2024).............................17

*Green v. Mansour*, 474 U.S. 64 (1985)......................................................................................7–8

*Haaland v. Brackeen*, 599 U.S. 255 (2023)................................................................................16

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ...........................................................15

*Ind. Right to Life Victory Fund v. Morales*, 66 F.4th 625 (7th Cir. 2023).............................17–18

*Kling v. Hebert*, 60 F.4th 281 (5th Cir. 2023) ............................................................................1

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) .................................................................8, 14

*Massachusetts v. Mellon*, 262 U.S. 447 (1923) ........................................................................14

*McHugh v. Ill. Dep't of Transp.*, 55 F.4th 529 (7th Cir. 2022) ......................................1, 20

*Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536 (7th Cir. 2006) .....................................2

*Mi Familia Vota v. Ogg*, 105 F.4th 313 (5th Cir. 2024) .........................................................12

*Minn. RFL Republican Farmer Lab. Caucus v. Moriarty*, 108 F.4th 1035 (8th Cir. 2024) ............................................................................................................................................12

*Murthy v. Missouri*, 603 U.S. 43 (2024) ....................................................................................16

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340 (1978) ...................................................20

*Palmetto Properties, Inc. v. Cnty. of DuPage*, 160 F. Supp. 2d 876 (N.D. Ill. 2001) ..................12

*Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't Health*, 699 F.3d 962 (7th Cir. 2012) ...................................................................................................................12

*Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818 (10th Cir. 2007) .............................12

*Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002 (7th Cir. 2021) ..................................................................................................................................16–18

*Regan v. Tax'n With Representation of Wash.*, 461 U.S. 540 (1983) ................................19

*Sapperstein v. Hager*, 188 F.3d 852 (7th Cir. 1999) ..............................................................2

*Sherman v. Cmty. Consol. Sch. Dist. 21 of Wheeling Twp.*, 980 F.2d 437 (7th Cir. 1992) ............................................................................................................................................12

*Sherwood v. Marchiori*, 76 F.4th 688 (7th Cir. 2023) ............................................................1

*Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26 (1976) .......................................................16

*Speech First, Inc. v. Killeen*, 968 F.3d 628 (7th Cir. 2020) ...............................................17

*Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326 (11th Cir. 1999) ...........................12

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ..........................................13–14

*Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433 (2017) ...............................................17

*Va. Office for Protection & Advocacy v. Stewart*, 563 U.S. 247 (2011) ..................8, 10

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635 (2002) ............................8

*Weinstein v. Edgar*, 826 F. Supp. 1165 (N.D. Ill. 1993) .....................................................11

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) ............................................................................14

*Whole Woman's Health v. Jackson*, 595 U.S. 30 (2021) ...............................................7–11

**Statutes**

26 U.S.C. § 501 ..............................................................................................................3, 5–7, 19

20 ILCS 5/5-15 ...........................................................................................................3

20 ILCS 1505/1505-15 ..............................................................................................3

820 ILCS 57/1 ...........................................................................................................1

820 ILCS 57/10 .........................................................................................................4

820 ILCS 57/15 ......................................................................................................2–3

820 ILCS 57/20 .........................................................................................................4

820 ILCS 57/25 ...........................................................................4–5, 9–10, 14–15

820 ILCS 57/35 ...............................................................................................3, 17–19

820 ILCS 105/7 ......................................................................................................3–4

820 ILCS 105/11 .......................................................................................................4

820 ILCS 115/11 ....................................................................................................3–4

820 ILCS 130/6 .........................................................................................................4

820 ILCS 130/9 .........................................................................................................3

820 ILCS 130/10 ....................................................................................................3–4

820 ILCS 130/11 .......................................................................................................3

820 ILCS 175/55 ......................................................................................................10

820 ILCS 175/67 ......................................................................................................10

820 ILCS 175/70 ......................................................................................................10

820 ILCS 175/75 ......................................................................................................10

## Rules

Fed. R. Civ. P. 12 ................................................................................................1, 20

Fed. R. Civ. P. 26 ....................................................................................................20

## Administrative Materials

Int. Rev. Serv., 2023 Instructions for Schedule R (Aug. 29, 2023), https://www.irs.gov/pub/irs-pdf/i990sr.pdf .........................................................6

## Other Authorities

5B Fed. Prac. & Proc. Civ. § 1350 .....................................................................2, 20

B. Holly Schadler, *The Connection: Strategies for Creating and Operating 501(c)(3)s, 501(c)(4)(s) and Political Organizations* (4th ed. 2018) .....................................19

## Introduction

Sovereign immunity bars "suit against officers of a state merely to test the constitutionality of a state statute," unless the officers are "committing by some positive act a wrong or trespass." *Fitts v. McGhee*, 172 U.S. 516, 530 (1899). But Plaintiffs are attempting to bring just such a suit. They dislike the Worker Freedom of Speech Act ("Act"), 820 ILCS 57/1 *et seq.*, and view this pre-enforcement facial challenge as "a very convenient way for obtaining a speedy judicial determination of questions of constitutional law," *Fitts*, 172 U.S. at 530. But the Director is not threatening them with any injury, so they cannot overcome sovereign immunity or prove Article III standing. Indeed, Plaintiffs are especially unfit challengers of the Act because their planned conduct is likely exempt. This suit must therefore be dismissed without leave to amend for lack of subject-matter jurisdiction or, in the alternative, the Court should authorize limited discovery on factual disputes as to jurisdiction before proceeding any further.

## Applicable Legal Standards

The Director first raises a factual challenge to subject-matter jurisdiction under Eleventh Amendment sovereign immunity and due to Plaintiffs' lack of Article III standing. The Eleventh Amendment "deprives federal courts of jurisdiction when its immunity applies." *McHugh v. Ill. Dep't of Transp.*, 55 F.4th 529, 533 (7th Cir. 2022). The Director's sovereign-immunity and standing arguments are both properly considered under Rule 12(b)(1). *See Sherwood v. Marchiori*, 76 F.4th 688, 693–96 (7th Cir. 2023) (doing so); *see also Kling v. Hebert*, 60 F.4th 281, 284 (5th Cir. 2023) (factual sovereign-immunity defense properly raised under Rule 12(b)(1)). The Court may consider these jurisdictional issues in either order. *See Sherwood*, 76 F.4th at 694 n.4 (citing *Amling v. Harrow Indus. LLC*, 943 F.3d 373, 379 (7th Cir. 2019)). "The party asserting federal jurisdiction bears the burden of demonstrating its existence." *Farnik v. F.D.I.C.*, 707 F.3d 717, 721 (7th Cir. 2013).

The Director mounts a factual challenge to jurisdiction because she submits "evidence calling [jurisdiction] into question." *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009); *see also Sapperstein v. Hager*, 188 F.3d 852, 855 (7th Cir. 1999) (factual challenge arises "[w]here evidence pertinent to subject matter jurisdiction has been submitted"). "When considering a motion that launches a factual attack against jurisdiction, '[t]he district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists.'" *Apex Digital*, 572 F.3d at 444 (quoting *Evers v. Astrue*, 536 F.3d 651, 656–57 (7th Cir. 2008)). In a factual challenge, then, "there is no presumption of truthfulness attached to the plaintiff's allegations." 5B Fed. Prac. & Proc. Civ. § 1350. Instead, "a proponent of federal jurisdiction must, if material factual allegations are contested, prove those jurisdictional facts by a preponderance of the evidence." *Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536, 543 (7th Cir. 2006).

The Director contends, in the alternative and on specific issues as discussed below, that Plaintiffs fail adequately to plead the existence of subject-matter jurisdiction. In considering a facial attack against jurisdiction, in contrast, "the court does not look beyond the allegations in the complaint, which are taken as true for purposes of the motion." *Apex Digital*, 572 F.3d at 444.

## Background

**The Worker Freedom of Speech Act**

When it goes into effect on January 1, 2025, the Act will provide that an employer "may not discharge, discipline, or otherwise penalize, threaten to discharge, discipline, or otherwise penalize, or take any adverse employment action against an employee" who engages in certain protected activities. 820 ILCS 57/15. The Act defines three types of protected activity. The primary type is to "decline[] to attend or participate in an employer-sponsored meeting or decline[] to receive or listen to communications from the employer … if the meeting or communication is to

2

communicate the opinion of the employer about religious matters or political matters." *Id.* 57/15(1). The others derive from the first: An employer may not retaliate "as a means of inducing an employee" to attend or listen, and an employer may not retaliate against an employee who reports "a violation or a suspected violation" of the Act. *Id.* 57/15(2)–(3).

Eight exceptions refine the scope of the Act's protections. First, an exception reiterates that the Act does nothing to limit "voluntary" attendance at meetings or receipt of communications. *Id.* 57/35(2). Second, the Act does not prohibit mandatory meetings and communications when necessary to comply with other laws. *See id.* 57/35(1), (4). Third, the Act contains five exceptions to ensure that employers can still hold mandatory meetings about religious and political matters to fulfill the employer's mission. One exception allows "communicating … any information that is necessary for the employees to perform their required job duties." *Id.* 57/35(3). Further exceptions create safe harbors for employers with political or religious missions: "an institution of higher education," an electoral organization, "a not-for-profit organization that is exempt from taxation under [26 U.S.C. §§] 501(c)(4), 501(c)(5), or 501(c)(6)," a "legislative or regulatory body," or "a religious organization." 820 ILCS 57/35(5)–(8).

**The Director's Role with Respect to the Act**

To start, the Director has no general enforcement powers that would apply to the Act. The Illinois Civil Administrative Code creates the Department of Labor, 20 ILCS 5/5-15, but grants it only aspirational powers, such as "to foster, promote, and develop the welfare of wage earners." *Id.* 1505/1505-15. The Director has no overarching authority of investigation or enforcement as to Chapter 820 of the Illinois Compiled Statutes, where employment laws are found. *See* Declaration of Jane R. Flanagan ("Flanagan Decl."), Exhibit 1, ¶¶ 4–6. Instead, each Illinois statute sets forth the Director's specific powers under that statute. *See, e.g.*, 820 ILCS 105/7 (Minimum Wage Law); *id.* 115/11 (Wage Payment and Collection Act); *id.* 130/9 to 11 (Prevailing Wage Act).

3

Focusing on the Act itself, then, the Act creates two enforcement mechanisms: a private right of action for an "aggrieved employee," *id.* 57/20, and a provision whereby an "interested party" may recover a portion of civil penalties on behalf of the State, *id.* 57/25. The Director has no role at all with the former, and barely any role with the latter.

As to investigation, section 25 authorizes the Department to "inquire into any alleged violations" that are "brought to its attention by an interested party." *Id.* 57/25(a). So the Director cannot "inquire" without a third-party complaint by an interested party, defined as "an organization that monitors or is attentive to compliance with public or worker safety laws, wage and hour requirements, or other statutory requirements." *Id.* 57/10. And the Act does not back up the word "inquire" with coercive power. As just one illustrative example, other statutes that use the word "inquire" also give the Director explicit subpoena power, *e.g.*, *id.* 105/7(c), 11(d); *id.* 115/11; *id.* 130/6, 10; but the Act does not, *see* Flanagan Decl., Ex. 1, ¶¶ 7–8.

As to litigation, section 25 creates a civil penalty of $1000 per violation payable to the Department. 820 ILCS 57/25(a). "An interested party who prevails in a civil action" receives "10% of any statutory penalties assessed." *Id.* 57/25(e). The Act authorizes the Department "to institute the actions for the penalties provided in this Section and to enforce the provisions of this Act." 820 ILCS 57/25(a). But the Director may only "institute *the actions* … provided in this Section." *Id.* (emphasis added). "The actions" can only be filed by a third party, not the Director: "an interested party may assert that a violation for this Act has occurred and bring an action for penalties." *Id.* 57/25(b). Similarly, the section 25 statute of limitations presupposes a third-party complaint: "*Any* claim or action filed under this Section must be made within 3 years after the alleged conduct *resulting in the complaint*." *Id.* 57/25(d) (emphasis added).

Under section 25, this complaint-based process runs through the Department but without a

4

decisive role for the Department. The interested party files a complaint with the Department. *Id.* 57/25(b)(1). The Department tells the defendant that a complaint has been filed against it. *Id.* 57/25(b)(2). The Department may issue a "notice of right to sue to the interested party." *Id.* 57/25(b)(4). But the interested party does not need that notice in order to sue: "If, within 180 days after service of the notice of complaint to the parties, the Department has not" acted on the complaint, then "the interested party may initiate a civil action for penalties." *Id.* 57/25(c).

The Director agrees with the legal position taken in this brief as to the scope of her authority under the Act. *See* Flanagan Decl., Ex. 1, ¶ 3. The Director does not understand any part of the Illinois Compiled Statutes to grant her power to enforce the Act beyond what is provided in the Act itself: administering the section 25 provision to tell a defendant when a complaint has been filed against it and sending the "notice of right to sue" after 180 days. *Id.* ¶¶ 4–12. The Director has no intention of taking further affirmative enforcement measures. *Id.* ¶ 11.

**Plaintiff Illinois Policy Institute and Its Sister Illinois Policy Action**

Plaintiff Illinois Policy Institute ("IPI") is "a free market oriented think tank." *See* Illinois Policy Institute, Return of Organization Exempt from Income Tax, at 1 (2022) (Exhibit 2). IPI has an inherently political mission: It adopts "a perspective" favoring "limited government" and "free markets." ECF 8 ¶ 4. IPI claims to be exempt from federal income tax under § 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3). *See* Ex. 2 at 1.

IPI's tax return discloses a "related tax-exempt organization" called the Government Accountability Alliance. *Id.* at 41. The Government Accountability Alliance also does business under the names "Illinois Policy Action" and "Illinois Policy." *See* Government Accountability Alliance, Return of Organization Exempt from Income Tax, at 1 (Exhibit 3); *see also* Exhibits 4–5 (Secretary of State filings for assumed names). Illinois Policy Action ("IPA") describes itself as "an independent government watchdog advocating for the people of Illinois and working to turn

free-market ideas into law." Ex. 3 at 1. IPA claims to be exempt from federal income tax under § 501(c)(4) of the Internal Revenue Code, 26 U.S.C. § 501(c)(4). *Id.* IPA likewise declares IPI to be a "related tax-exempt organization" on IPA's own tax return. *Id.* at 39.

An Internal Revenue Service ("IRS") publication explains when tax-exempt organizations must disclose one another as related organizations. *See* Int. Rev. Serv., 2023 Instructions for Schedule R (Aug. 29, 2023), https://www.irs.gov/pub/irs-pdf/i990sr.pdf. The likely reason for IPI and IPA is that they are in a "Brother/Sister" relationship because they are "controlled by the same person or persons." *Id.* at 1. In tax year 2022, the most recent year for which their returns are publicly available, IPI and IPA disclosed the exact same 14 key employees with almost all the same titles. *See* Ex. 2 at 7; Ex. 3 at 7. The only difference was that Amy Korte served as "Director of Policy" for IPI but as "Executive Vice President" for IPA.

IPI and IPA share a single website titled "Illinois Policy." The "Who We Are" page on the website states: "The Illinois Policy Institute is a nonpartisan 501(c)(3) research organization. Our partner organization, Illinois Policy, is an independent, nonpartisan 501(c)(4) advocacy organization." Illinois Policy, *Who We Are* (as captured Dec. 20, 2024) (Exhibit 6) at 2. The page lists 42 employees, board members, and other people associated with IPI or IPA without distinction between the two groups. *See id.* at 2–7. IPI and IPA issue one combined annual report. *See* Illinois Policy, 2023 Annual Report (as captured Dec. 20, 2024) (Exhibit 7). The report states that the groups plan to "exploit" "opportunities for free-market ideas to become law." *Id.* at 2. The financial summary in the report presents budgets for both IPI and IPA. *Id.* at 29–32.

**Plaintiff the Technology & Manufacturing Association**

The Technology & Manufacturing Association ("TMA") is an "organization of precision manufacturing and supplier companies" that "represent[s] and promot[es] the interests of member companies." The Technology and Manufacturing Association, Return of Organization Exempt

6

from Income Tax, at 2 (2021) (Exhibit 8). It claims to be exempt from federal income tax under § 501(c)(6) of the Internal Revenue Code, 26 U.S.C. § 501(c)(6). Ex. 8 at 1. TMA "is exempt from the Act as a 501(c)(6) nonprofit." ECF 8 ¶ 44. TMA does not provide any information about any specific member: Every mention of TMA members in the complaint, the preliminary-injunction motion, and TMA's supporting declaration refers to "members," plural. ECF 8 ¶¶ 6–7, 10, 13, 45–47; ECF 9-1 at 2, 6, 12, 14; ECF 10-1 ¶¶ 7–11.

**Plaintiffs' Pre-Enforcement Facial Challenge to the Act**

Plaintiffs seek to enjoin the Director's enforcement of the Act in all circumstances, ECF 8 at 12 ¶ D, contending that the Act violates the First Amendment on its face, *id.* ¶¶ 48–57, and that the National Labor Relations Act ("NLRA") preempts the Act, *id.* ¶¶ 58–65.

**Argument**

**I.    Plaintiffs cannot demonstrate that they overcome sovereign immunity or that they have Article III standing.**

The Act is enforced only by private parties whom Plaintiffs cannot identify and whom the Director cannot control. This reality creates two jurisdictional problems for Plaintiffs. First, Plaintiffs cannot establish the *Ex parte Young* exception to sovereign immunity because they have not sued an "officer[] of the state … who threaten[s] and [is] about to commence proceedings" against them. 209 U.S. 123, 155–56 (1908). Second, Plaintiffs cannot show Article III standing because their injuries depend on the speculative possibility of private suits against them and, in any event, no relief granted against the Director could prevent such suits.

**A.    The *Ex parte Young* exception does not apply because Plaintiffs have not sued a state official about to enforce the Act against them.**

"Generally, States are immune from suit under the terms of the Eleventh Amendment and the doctrine of sovereign immunity." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021). "The landmark case of *Ex parte Young* created an exception to this general principle by asserting

that a suit challenging the constitutionality of a state official's action in enforcing state law is not one against the State." *Green v. Mansour*, 474 U.S. 64, 68 (1985) (citation omitted). The *Ex parte Young* exception "rests on the premise—less delicately called a 'fiction'—that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes." *Va. Office for Protection & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011) (citation omitted). Under *Ex parte Young*, "federal courts cannot repeal state laws"; they can at most "prevent[] state officials from enforcing the challenged statute, regulation, or agency action in the future based on its incompatibility with federal law." *Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 521–22 (7th Cir. 2021).

The *Ex parte Young* exception is "narrow." *Whole Woman's Health*, 595 U.S. at 39. True, the exception poses "a straightforward inquiry" into whether the plaintiffs (1) demonstrate "an ongoing violation of federal law" and (2) "seek relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002). *Verizon Maryland* reviewed a facial motion to dismiss, so the Supreme Court asked whether "the complaint allege[d]" the two elements. *Id.* The Director brings a factual challenge to jurisdiction, however, so Plaintiffs "bear[] the burden of coming forward with competent proof that [jurisdiction] exists." *Apex Digital*, 572 F.3d at 444. Jurisdiction "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Plaintiffs cannot prove the first element, "an ongoing violation of federal law." In order to do so, Plaintiffs must first "direct" the court to some "enforcement authority the [Director] possesses in connection with [the Act] that a federal court might enjoin [her] from exercising." *Whole Woman's Health*, 595 U.S. at 43; *see also Doe v. Holcomb*, 883 F.3d 971, 975 (7th Cir.

8

2018) ("[A] plaintiff must show that the named state official plays some role in enforcing the statute in order to avoid the Eleventh Amendment."). A violation is not "ongoing" if the defendant official lacks "the power to enforce, modify, or rescind" the challenged policy. *Driftless*, 16 F.4th at 515. Second, Plaintiffs must show that the Director is "about to commence proceedings, either of a civil or criminal nature, to enforce against [them] an unconstitutional act." *Ex parte Young*, 209 U.S. at 156; *see also Holcomb*, 883 F.3d at 977 (claim dismissed where "[t]he Attorney General has not threatened to do anything"). Plaintiffs cannot show that the Director has any authority to enforce the Act against them, let alone that she threatens to do so.

### 1. The Director lacks authority to enforce the Act.

The Director possesses no "enforcement authority" with respect to the Act that this Court "might enjoin [her] from exercising." *Whole Woman's Health*, 595 U.S. at 43. The Director lacks any coercive power to initiate investigations or to prosecute actions under section 25. The Director may "inquire into any alleged violations," though only if "brought to [her] attention by an interested party." 820 ILCS 57/25(a). But this power to "inquire" has no teeth. The Director cannot, for instance, issue subpoenas to back up her inquiry. *See* Flanagan Decl., Ex. 1, ¶ 7.

As for dispute resolution, the Director merely brings the parties together, after which she lacks any meaningful involvement. Only third parties, not the Director, may file the complaints that start a possible suit. *See* 820 ILCS 57/25(b), (d). The Director must then give the defendant "notice" that a complaint has been filed against it. *Id.* 57/25(b)(2). The notice triggers a 180-day waiting period, during which the defendant may attempt to "contest" or "cure" "the alleged violation." *Id.* 57/25(b)(2)–(3). The Director then "issues a notice of right to sue," but this notice says nothing about the merits: It issues whether the Director believes the allegation was "cured," "unjustified," or "justified," or even if the Director "has not made a determination." *Id.* 57/25(b)(4). In any event, the right-to-sue letter is an empty formality under the Act. Even if "the

Department has not … issued a right to sue letter," the interested party still "may initiate a civil action for penalties" after 180 days. *Id.* 57/25(c). Plaintiffs concede that an interested party can simply file 180 days after service without further action by the Director. *See* ECF 8 ¶ 22; ECF 9-1 at 4. The Director can ratify the parties' "mutually agreed extensions" of this 180-day period, 820 ILCS 57/25(c), but a power to rubber-stamp agreed extensions is no power at all.[1]

There is thus no effective relief that this Court could grant to bar enforcement of the Act. The Court cannot enjoin "any and all unnamed private persons who might seek to bring their own [section 25] suits." *Whole Woman's Health*, 595 U.S. at 44. As for the Director, much like the court clerks in *Whole Woman's Health*, she serves only "to file cases as they arrive," so she is not a proper defendant. *Id.* at 40. That is, she "was not specifically charged with a duty to enforce" the Act through section 25. *Holcomb*, 883 F.3d at 976. The Director indeed "cannot do anything … to prosecute a violation of" the Act. *Id.* at 977. She therefore retains her sovereign immunity.

### 2. The Director is not threatening enforcement against Plaintiffs.

Plaintiffs have another problem. Even if, as a legal matter, they could identify sufficient involvement by the Director with the Act, they cannot factually show the Director's "ongoing violation of federal law." *Va. Office*, 563 U.S. at 255. The Director has sworn that her only roles with section 25 are to tell defendants when complaints are filed against them and to issue right-to-sue letters. *See* Flanagan Decl., Ex. 1, ¶¶ 9–11. The Director does not intend to do anything else with respect to the Act, including any investigation or enforcement activities (activities that the Act does not, in any event, authorize her to undertake). *Id.* ¶¶ 11–12.

---

[1] To be sure, the Act states that, before issuing a right-to-sue letter, the Director may decline "jurisdiction" or "conclude[] administrative enforcement of the matter." 820 ILCS 57/25(b)(4)(C). But the General Assembly imported section 25 wholesale from a different law, the Day and Temporary Labor Services Act, *see id.* 175/67 (verbatim provision under that law), and in that law, unlike the Worker Freedom of Speech Act, other sections provide the Director with fulsome administrative investigation and enforcement powers, *see id.* 175/55, 70–75. The language has no effect under this Act. *See* Flanagan Decl., Ex. 1, ¶ 12.

The *Ex parte Young* exception, in contrast, has always been limited to state officials "who threaten and are about to commence proceedings, either of a civil or criminal nature." 209 U.S. at 156. In *Ex parte Young* itself, the defendant official had ignored the injunction entered against him and "commenced proceedings to enforce." *Id.* at 160. Plaintiffs may overcome sovereign immunity only as to specific state officials actively threatening enforcement: "[W]here the state official … *is about to commence suits* which have for their object the enforcement of an act which violates the Federal Constitution … [t]he sovereignty of the state is, in reality, no more involved." *Id.* at 167 (emphasis added). Thus, *Ex parte Young* holds that "federal courts may in some circumstances grant injunctive relief against state officers who *are violating, or planning to violate*, federal law." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015) (emphasis added).

The history of equity jurisprudence leading up to *Ex parte Young* confirms its restriction to threatened violations. Though now viewed as a seminal case, *Ex parte Young* simply construed "[t]he equitable power of federal courts" as "limited by historical practice." *Whole Woman's Health*, 595 U.S. at 44. The cases upon which *Ex parte Young* relied emphasized the need for an impending threat of enforcement. *Ex parte Young* cited *Ex parte Ayers*, 123 U.S. 443 (1887), for the central proposition that a "state has no power to impart to [a state official] any immunity from responsibility to the supreme authority of the United States." 209 U.S. at 160. *Ex parte Ayers* was limited to "officers of the state threatening the distraint complained of." 123 U.S. at 500. *Ex parte Young* further relied on *Fitts v. McGhee*, 172 U.S. 516 (1899), a case that is cited down to the present in its own right. *See, e.g.*, *Bevis v. City of Naperville*, 657 F. Supp. 3d 1052, 1060 (N.D. Ill.), *aff'd*, 85 F.4th 1175 (7th Cir. 2023); *Weinstein v. Edgar*, 826 F. Supp. 1165, 1166 (N.D. Ill. 1993). *Fitts* clearly held that what we now call the *Ex parte Young* exception requires an impending threat: "[T]he defendants in each of those cases were officers of the state, specially charged with

the execution of a state enactment alleged to be unconstitutional, but under the authority of which, it was averred, they were committing, or were about to commit, some specific wrong or trespass to the injury of the plaintiffs' rights." 172 U.S. at 529.

The Seventh Circuit, in accordance with this history, holds that *Ex parte Young* requires a threat of enforcement by the defendant official. The *Ex parte Young* exception did not apply in *Holcomb* in part because "[t]he Attorney General ha[d] not threatened to do anything." 883 F.3d at 977. Likewise, the Seventh Circuit has stated that *Ex parte Young* would not apply where a state official was "not threatening [the plaintiff] with an enforcement action." *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't Health*, 699 F.3d 962, 983 (7th Cir. 2012). And the Seventh Circuit dismissed under *Ex parte Young* "a suit against the Attorney General, who has never threatened the [plaintiffs] with prosecution and as far as we can tell has no authority to do so." *Sherman v. Cmty. Consol. Sch. Dist. 21 of Wheeling Twp*., 980 F.2d 437, 441 (7th Cir. 1992); *see also CSWS, LLC v. Madigan*, 2009 WL 1789368, at *2–3 (N.D. Ill. June 24, 2009) (same); *Palmetto Properties, Inc. v. Cnty. of DuPage*, 160 F. Supp. 2d 876, 880 (N.D. Ill. 2001) (same).

A large majority of the courts of appeals have likewise held that "*Ex parte Young* only applies to officials who threaten and are about to commence civil or criminal proceedings to enforce unconstitutional policies." *Minn. RFL Republican Farmer Lab. Caucus v. Moriarty*, 108 F.4th 1035, 1037 (8th Cir. 2024); *see also Aroostook Band of Micmacs v. Ryan*, 404 F.3d 48, 65 (1st Cir. 2005); *1st Westco Corp. v. Sch. Dist. of Philadelphia*, 6 F.3d 108, 114 (3d Cir. 1993); *Doyle v. Hogan*, 1 F.4th 249, 255 (4th Cir. 2021); *Mi Familia Vota v. Ogg*, 105 F.4th 313, 327 (5th Cir. 2024); *Children's Healthcare is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412, 1414 (6th Cir. 1996); *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 828 (10th Cir. 2007); *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1338 (11th Cir. 1999). The Sixth Circuit in

*Children's Healthcare* specifically held that "the phrase 'some connection with the enforcement of the act,'" as used in *Ex parte Young*, "does not diminish the requirement that the official threaten and be about to commence proceedings." 92 F.3d at 1416 (quoting *Ex parte Young*, 209 U.S. at 157). The Seventh Circuit cited *Children's Healthcare* with approval in *Holcomb*, 883 F.3d at 977.

The requirement of threatened enforcement dooms Plaintiffs' bid to overcome sovereign immunity. There is no evidence at all that the Director is "about to commit [] some specific wrong or trespass to the injury of the plaintiffs' rights." *Fitts*, 172 U.S. at 529. On the contrary, the only record evidence on this point is the Director's sworn affidavit that she has no authority or intention to enforce the Act affirmatively. *See* Flanagan Decl., Ex. 1, ¶¶ 11–12. The Director remains immune from suit about the Act.

**B.  Plaintiffs cannot demonstrate Article III standing because their injuries are speculative and would not be redressed by an injunction against the Director.**

The Court also lacks jurisdiction over this suit because Plaintiffs have not established Article III standing to pursue any of their claims. "The fundamentals of standing are well-known and firmly rooted in American constitutional law. To establish standing, as [the Supreme] Court has often stated, a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 380 (2024). Plaintiffs cannot prove standing for the same reasons that they cannot overcome sovereign immunity. The Director, the only defendant in this suit, cannot affirmatively enforce the Act. A hypothetical suit against Plaintiffs by some third party is purely speculative and, in any event, cannot be prevented by any relief that this Court could grant.

**1.  Plaintiffs cannot show injury because there is no credible threat of enforcement against them.**

This suit is a pre-enforcement challenge, so Plaintiffs come to court with only "[a]n

allegation of future injury." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). Namely, they allege that they "plan to continue holding mandatory meetings," ECF 8 ¶ 42, but that "the Act bans" the meetings they want to hold, *id.* ¶ 34. A pre-enforcement challenger of a law "must be able to show, not only that the statute is invalid, but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement." *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923). Plaintiffs must show that "threatened enforcement" of the Act is "sufficiently imminent." *Susan B. Anthony*, 573 U.S. at 159. "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is '*certainly* impending.'" *Lujan*, 504 U.S. at 564 n.2 (emphasis in original) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). The key question as to imminence in pre-enforcement challenges is whether there exists a "credible threat of enforcement." *Susan B. Anthony*, 573 U.S. at 161.

Plaintiffs cannot show a credible threat of enforcement. The Director cannot do anything under the Act until an alleged violation is "brought to [her] attention by an interested party." 820 ILCS 57/25(a). Plaintiffs present no evidence that any interested party intends to file a complaint against them when the Act goes into effect on January 1, 2025. The Director is also not presently aware of anyone intending to do so. *See* Flanagan Decl., Ex. 1, ¶ 13. Plaintiffs thus rely on a "highly attenuated chain of possibilities" leading to possible injury. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). Because Plaintiffs have "no actual knowledge" about the risk of a complaint against them and must "merely speculate and make assumptions" about whether one will ever be filed, they lack standing. *Id.* at 411. In contrast, factors supporting a credible threat of enforcement include a "history of enforcement proceedings against similar conduct" and "the absence of a clear disavowal" by enforcement officials. *Brown v. Kemp*, 86 F.4th 745, 767 (7th

14

Cir. 2023); *see also Holder v. Humanitarian Law Project*, 561 U.S. 1, 16 (2010) (credible threat based on 150 past prosecutions and no disavowal). Here, there is no history of enforcement, and the Director has disavowed any authority to initiate enforcement of the Act. *See* Flanagan Decl., Ex. 1, ¶ 11. Plaintiffs cannot show an imminent injury.

2.    <strong>Plaintiffs cannot show causation and redressability because no relief granted against the Director could prevent their alleged injuries.</strong>

Plaintiffs also cannot identify any relief that could be granted by this Court that would prevent any eventual suits against them under the Act. "The second and third standing requirements—causation and redressability—are often flip sides of the same coin. If a defendant's action causes an injury, enjoining the action … will typically redress that injury." *Alliance for Hippocratic Medicine*, 602 U.S. at 380–81 (cleaned up). In addition, they often "overlap significantly" with "the requirements of *Ex parte Young*." *Holcomb*, 883 F.3d at 975. Under both doctrines, the plaintiff must "establish that his injury is causally connected to [the state official's] enforcement and that enjoining the enforcement is likely to redress his injury." *Id.* at 975–76.

So, for the same reasons that sovereign immunity bars this suit, an injunction against the Director cannot redress any injury that Plaintiffs might one day suffer. The Act provides that an interested party must file a complaint with the Director and then wait 180 days, 820 ILCS 57/25(b)(1), (c); but the Director has no power to dismiss the suit or to force the interested party to wait longer than 180 days, *id.* 57/25(b)(c). Plaintiffs admit as much: "After the Department issues a right to sue letter, *or* 180 days after the service of the complaint, the interested party may initiate a civil action for penalties against the employer." ECF 8 ¶ 22 (emphasis added); *see also* ECF 9-1 at 4 (same). The Director cannot act affirmatively to enforce the Act. *See* 820 ILCS 57/25(a); Flanagan Decl., Ex. 1, ¶ 11. Thus, Plaintiffs' injuries, if they ever came to pass, would result from suits initiated by third parties outside the Director's control pursuant to section 25.

15

But "it is a bedrock principle that a federal court cannot redress 'injury that results from the independent action of some third party not before the court.'" *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976)). "Plaintiffs bear the burden of pleading and proving concrete facts showing that *the defendant's* actual action has caused the substantial risk of harm.'" *Clapper*, 568 U.S. at 414 n.5 (emphasis added). Even where plaintiffs suffer harm that "counts as an Article III injury," they lack standing if "enjoining the [defendant] would not remedy the alleged injury" because it "would not give [plaintiffs] legally enforceable protection from the allegedly imminent harm." *Haaland v. Brackeen*, 599 U.S. 255, 292–93 (2023). That is precisely the situation here.

**II. Plaintiffs furthermore fail to allege Article III standing for reasons specific to them.**

This Court would likely lack jurisdiction over any pre-enforcement suit against the Director about the Act for the factual reasons discussed above. But, in the alternative, the complaint on its face fails to allege these specific Plaintiffs' standing to sue due to their particular shortcomings.

First, TMA fails to allege its associational standing, the only type of standing it asserts. *See* ECF 8 ¶ 13. TMA must "provide some way of showing that *at least one* individual member has standing to sue on their own." *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1010 (7th Cir. 2021) (emphasis in original). Dismissal is required where an association "speaks of its individual members only as a collective." *Id.* at 1009. *Prairie Rivers* left open whether TMA must identify a member by name, though the opinion strongly suggests that it must. *Id.* at 1011. In any event, this case is not a close call under *Prairie Rivers*. Every mention of TMA members in the complaint refers to "members" in the indeterminate plural form without saying anything about a specific member. ECF 8 ¶¶ 6–7, 13, 45–47. The Act's exceptions underline why TMA must identify a member. Communications that TMA members wish to convey may well fall into one of the eight exceptions, but it is impossible to know because TMA has not alleged anything

specific. In short, "[b]ecause [TMA] merely refers to its members in the collective, *Prairie Rivers* controls." *Goldman v. City of Highland Park*, 2024 WL 98429, at \*5 (N.D. Ill. Jan. 9, 2024).

TMA's claims must be dismissed, and only TMA alleges any injury related to NLRA preemption or religious liberty. *See* ECF 8 ¶¶ 45–46; *id.* at 12 ¶ B. So the NLRA claim (and the First Amendment claim to the extent it turns on a religious-liberty theory) should be dismissed alongside TMA. *See Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017).

Next, as to IPI, the Act exempts IPI's allegedly desired conduct. "It is a threshold requirement to establish a credible threat of enforcement that the statute actually cover the plaintiff's desired conduct." *Ind. Right to Life Victory Fund v. Morales*, 66 F.4th 625, 630 (7th Cir. 2023). That is, IPI must allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [the challenged] statute." *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979). Alternatively, in the First Amendment context, "a plaintiff may show a chilling effect on his speech that is objectively reasonable, and that he self-censors as a result." *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020).

IPI's allegedly desired conduct is exempt from the Act under exception (3), which excludes "communicating … any information that is necessary for the employees to perform their required job duties." 820 ILCS 57/35(3). IPI "publishes policy research on a variety of political topics," ECF 8 ¶ 35, so its everyday work involves speaking to employees about political matters. IPI alleges that it holds various mandatory meetings for "all staff," *id.* ¶¶ 36, 38, and others for "certain staff," *id.* ¶ 37. IPI alleges that it is "important" for its "functioning … to communicate about political matters … with its employees," "regardless of whether a specific employee is working on a specific topic." *Id.* ¶¶ 40–41. The exception allows "necessary" communications, and IPI alleges "important" communications. IPI therefore does not successfully allege that the Act "actually

cover[s] [its] desired conduct," *Ind. Right to Life*, 66 F.4th at 630; on the contrary, IPI comes forward with only a "subjective fear of chilling [that] is insufficient to sustain a court's jurisdiction under Article III," *Bell v. Keating*, 697 F.3d 445, 454 (7th Cir. 2012).

## III.    Finally, Plaintiffs fail to prove their standing for reasons specific to them.

In the final alternative, Plaintiffs also fail to prove, as a factual matter, that they have standing. Both Plaintiffs and the Director have submitted additional evidence outside the complaint that bears on standing. *See* ECF 10, 10-1; Exs. 1–8. The Court must thus "look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Apex Digital*, 572 F.3d at 444 (quotation omitted). A factual examination only deepens Plaintiffs' standing problems.

To start with TMA, the declaration of TMA's executive vice president, like the complaint, always refers to TMA "members" in the indeterminate plural form without saying anything about a specific member. ECF 10-1 ¶¶ 7–11. TMA has failed not only to allege but also to prove that it has standing. *See Prairie Rivers*, 2 F.4th at 1011 ("[S]tanding for at least one individual member remains an essential component of associational standing at each stage of litigation.").

As to IPI, its president has submitted a declaration confirming that exception (3) applies to IPI's desired conduct. IPI's president declares that IPI holds various mandatory meetings for "all staff," ECF 10 ¶¶ 4–5, and others for some staff, *id.* ¶ 8. He provides no details about the duties of any employee. He swears that it is "important for the functioning of [IPI] to communicate about political matters … with its employees" and that "[s]taff morale and team cohesion depend on every staff member" receiving such communications. *Id.* ¶¶ 9–10. Although IPI appears to advance a strained argument that exception (3) does not apply in an effort to gin up an injury, *see* ECF 9-1 at 5, the declaration merely underlines that IPI's allegedly desired communications are "necessary for [its] employees to perform their required job duties," 820 ILCS 57/35(3). At a minimum, if the

Court sees any doubt on this point, it should permit jurisdictional discovery about the topics of the meetings and the job duties of the employees to decide this issue based on facts.

Exception (6) poses a second problem for IPI's standing. IPI shares all senior employees and likely many lower-level employees with IPA. *See* Ex. 2 at 7; Ex. 3 at 7; Ex. 6 at 2–7. IPA, as an organization claiming income-tax exemption under 26 U.S.C. § 501(c)(4), is exempt from the Act "for the purpose of communicating [IPA's] political tenets or purposes." 820 ILCS 57/35(6). So are the employees in question on IPI time or IPA time when they are required to attend mandatory meetings? If it is IPA time, then the Act likely does not apply. In this factual challenge, the Court cannot simply credit IPI's allegations that only IPI time is involved. *See Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274, 279 (7th Cir. 2020). IPI must prove it.

IPI and IPA almost certainly have records that bear on this question. The main differences between § 501(c)(3) and § 501(c)(4) organizations are that donors may deduct contributions to a § 501(c)(3) but that a § 501(c)(4) has more freedom to engage in lobbying. *See Regan v. Tax'n With Representation of Wash.*, 461 U.S. 540, 543 (1983). One group of people may form an organization of each type, but they must then "ensure that the § 501(c)(3) organization [does] not subsidize the § 501(c)(4) organization; otherwise, public funds might be spent on an activity Congress chose not to subsidize." *Id.* at 545. So the two organizations must "keep records adequate to show that tax deductible contributions are not used to pay for lobbying." *Id.* at 544 n.6. Where sister organizations share employees, such records should reflect the hours worked for and compensation paid by each organization (or timely reimbursements among the organizations). *See* B. Holly Schadler, *The Connection: Strategies for Creating and Operating 501(c)(3)s, 501(c)(4)(s) and Political Organizations*, at 42–43 (4th ed. 2018) (Exhibit 9).

If the Court declines to dismiss this suit outright, then the proper procedure is jurisdictional

discovery and an evidentiary hearing on the factual questions as to IPI's standing. "[O]nce the district judge has reason to believe that there is a serious jurisdictional issue, he is obliged to resolve it before proceeding to the merits … ." *Crawford v. United States*, 796 F.2d 924, 929 (7th Cir. 1986); *see also Bazile*, 983 F.3d at 281 (same). "If the defendant thinks the court lacks jurisdiction, his proper course is to request an evidentiary hearing on the issue." *Crawford*, 796 F.2d at 928; *accord* Fed. R. Civ. P. 12(i). To resolve the jurisdictional issue, a district court "may allow discovery to be completed on the issue and order a further hearing to be held before ruling on the Rule 12(b)(1) motion." 5B Fed. Prac. & Proc. Civ. § 1350; *see also Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 n.13 (1978) ("[W]here issues arise as to jurisdiction or venue, discovery is available to ascertain the facts bearing on such issues."). To that end, if the Court declines to dismiss this suit in its entirety, then the Director seeks leave to serve on IPI the discovery requests attached as Exhibits 10–11 to this memorandum. *See* Fed. R. Civ. P. 26(d)(1) (permitting early discovery "by court order").

## Conclusion

The complaint should be dismissed for lack of subject-matter jurisdiction without leave to amend and without prejudice. *See McHugh*, 55 F.4th at 535 (Eleventh Amendment dismissal is without prejudice); *Flynn v. FCA US LLC*, 39 F.4th 946, 954 (7th Cir. 2022) (same as to standing). In the alternative, the Court should dismiss TMA, authorize service of the proposed discovery attached as Exhibits 10–11, and set this matter for an evidentiary hearing on IPI's standing only.

Dated: December 24, 2024        Respectfully submitted,

Alex Hemmer               KWAME RAOUL,
R. Henry Weaver           Attorney General of Illinois, on behalf of
Office of the Illinois Attorney General  Defendant Jane R. Flanagan
115 S. LaSalle St.
Chicago, IL 60603           By:  */s/ R. Henry Weaver*
*robert.weaver@ilag.gov*            Assistant Attorney General
(312) 814-3000